Case numbers 15-4385 and 15-4400, Atlas Noble LLC v. Krizman Enterprises et al. And case number 16-3002, Atlas Noble v. Bo J. Croxton. Argument not to exceed 15 minutes for the plaintiff, 15 minutes to be shared by the defendants and intervener. Mr. Diaz, you may proceed for the appellant. Thank you. May it please the Court, Derek Diaz on behalf of Atlas Noble LLC. With me this morning is my co-counsel, Mr. Christopher Wick. And also with us this morning is Mr. Joel Heiser, General Counsel of Atlas Energy Group. With the Court's permission, I'd like to reserve three minutes for rebuttal. In September 2012, Atlas entered into a contract for the purchase of mineral rights to 2,411 acres of property in Tuscaroras County of Ohio. That deal fell through. The issue in the main appeal before this Court is what happens to the $2.4 million that Atlas deposited into escrow for earnest money. The answer to that question depends on whether the sellers satisfied their contractual duties by a relevant deadline. Well, not necessarily if you breached anticipatorily. Well, if they didn't satisfy their duties by the deadline, then, Your Honor, their anticipatory repudiation argument assumes that the deadline was midnight. What language do you rely upon to say that the deadline for that, as opposed to the deadline for your review, was 5 p.m.? Where do you find the language for that? Your Honor points out the deadline for the review was at 5.01 p.m. But the agreement doesn't say a thing in the world about their performance being complete by that time. Right. What the agreement does say is that Atlas has the ability and has to review all of their title documents. By 5.01. By 5.01. Right. So if they come up with new title documents, new leases, after 5.01, Atlas doesn't have the ability to. . . But you agreed to the 5.01. I mean. . . You could have, too. . . I mean, you were 51 minutes late in this case. It's really that simple. I mean, you terminate. . . For some reason, you terminate at 5.52. You know, you had to terminate by 5.01. There's nothing ambiguous about 5.01. It's like as unambiguous a contractual term as we could get. And you guys were late. And all this stuff about, oh, you know, we couldn't see the documents and so on. If there was a problem with the title for this one gentleman's property or whatever it was, you could have pulled the plug. Sole discretion. You could have pulled the plug because it was a Tuesday and you didn't want to close on a Tuesday. And you guys just didn't do anything until 5.52. It's actually an alternative view of the case, and you might want to address both of them. The other theory is that you were too early instead of too late. Well, that's both. Both, actually. I think it's both. Because, I mean, the other theory is that the provisions of state law kick in and, you know, they have until 11.59 to come up with the pertinent information. I mean, so, you know, that's the alternative view. You might want to try to answer both of them. Well, that's tough. Sorry. Sorry for the speech and compound question. I apologize for that. Well, I thought it was best to get the alternative view in before he started talking. You have the floor. Go ahead. I can start with the way the district court decided it. And the district court decided that the sellers had until 11.59 to complete their duties. And the question of them having failed to do that at 5.01 was a factor of Atlas supposedly walking away from its review period rights. Now, the idea that we had to terminate by 5.01, that's the contractual termination clause doesn't say that. I mean, even the sellers admit. Okay, so the crucial factors. You could just review by 5.01, but then you have some period of time, I guess, up to midnight to actually terminate. But you're not allowed to look at the documents after 5.01? I mean, is that the argument? No, the argument, Your Honor, is that we can approve and reject title before 5.01. Okay, right. After 5.01, we have lost the ability to reject title. Yeah. And, you know, I'm sympathetic to the sort of last-minute stuff that was going on. But an alternative would have been to, you know, if you chose not to terminate before 5.01, the alternative after 5.01 is to go through with the closing. And then if there's defective title as to particular pieces of property, you sue and get damages for those defects. Well, but in Your Honor's scenario, so they come at 5.30 with what they say is a lease. It's written in Crayola, and it has pictures and arrows, and they say, well, you know, you've lost the ability to accept or reject this. Right, and you get damages. And we'll, you know, a court will get you damages for that lease. My advice would be terminate before 5.01 if that property does not, by 5.01, have proper title. And, you know, that means they can't come half an hour later with a crayon document to fix the defect. But, you know, if you're after 5.01, go to a court and say this is not what they were supposed to deliver as to that property. Well, going to Your Honor's scenario, we did send an e-mail at 4.56 that says if we do not get these things by 5.01, the deal's off. You should have terminated before 5.01. You didn't get them. I mean, it's just we can't help and we enforce contracts. We don't sort of rescue people that don't exercise their rights under them. Well, the court's task is to enforce the party's intent. The court's task is to enforce the contract. I'm not trying to get into anyone's head. I look at the piece of paper. I read it fairly and partially. That's what we're empowered to do. And the idea is that the language of the contract is supposed to reflect the party's intent. And here. Sometimes it doesn't. Right? And who suffers then? Well. If it doesn't, if the intent and the words don't line, we go by the words. Well, but. Your argument is that courts shouldn't read language in an unreasonable way, I gather. Is that what you're saying? No, Your Honor. My argument is that the intent, the party's intent, is clear reading the contract as a whole. Okay. This contract? That's correct, Your Honor. And so. I'm sorry. Go ahead. The point is, however you view it, the language of the contract says nothing in connection with 501 about termination time. Right? It says review time. That's correct, Your Honor. So where are we supposed to get termination language? So the idea is that it's a two-step process, and that's the way the contract was set up. You have the 501 deadline, and then you have the midnight deadline. And so if at the end of the 501 deadline the sellers have a title, defensible title, to sufficient acreage, then you can proceed to the midnight deadline with the closing, which involves exchanging original documents or tendering funds or wiring funds. That's a judgment you make in your sole discretion before 501, right? Whether they have adequate title to a sufficient percentage. That's correct, Your Honor. Okay. And so here it was made clear that a certain percentage of acreage was rejected, and if that acreage wasn't fixed, then the deal would fall through. By what time? Fixed by what time? That's the question, Your Honor. And our point is that if you interpret the contract as a whole, then you see this two-tiered structure, which is the means of preserving ATLAS's ability to review documents. What's the answer, your answer, that you hope this Court adopts for what time? I ask what time. You said good question.  What's the answer? The interpretation that's holistic and doesn't create conflict within the contract itself is that the deadline is by 501 for the sellers to acquire sufficient title to sufficient acreage. And if that occurs... Is the language to be in a position rather than acquire, to be in a position? That's for the closing, Your Honor. Okay. So did they have good title to a sufficient percentage here by 501? They did not, Your Honor, and that's what... I mean, doesn't the contract, if we read it as a whole, anticipate that if you believe that is the case, you would terminate before 501? Well, I don't know that it would require us to terminate... Why wouldn't you? Well, because if we have the ability to review title until 501, and 501 comes and they haven't acquired title to sufficient acreage, then we can terminate at that point. You know, should we have terminated at 502 versus 552? No, I mean, if you go beyond 501, there's no limit that we can draw until midnight. I mean, isn't it fair to say that you have to terminate before 501? I mean, that's... We're going to make this sensible. Well, I don't know that there's a contractual basis to say that we have to terminate before 501. If we have the ability to review and reject title before then... It seemed to be an enormously risky move. If you think they don't have the right percentage by 501 to just sail past 501, that is an enormously risky thing. Well, and again, Your Honor, we did try to deal with it. 456, we sent the email and said, if we do not have these documents by 501, the deal can't close. So is that tantamount to a termination or saying, you know, we hereby invoke our rights? I think it could be, and it might satisfy Your Honor's concern, but it might not. So what the sellers have admitted in their briefs is that if Atlas had not terminated and the seller showed up to closing still without any item necessary in hand, then the buyer could have properly refused to close the transaction. So they admit they needed these leases in hand at a certain time. They say it was at midnight. We say it's at 501. Your time is up. Thank you. Good morning, Your Honors. May it please the Court, Mr. Diaz, Mr. Wick, Mr. Freeman. My name is Dave Dingwell. I represent the appellees, in this case, Chrisman Enterprises, Wayne Hammond Enterprises, and MKE Producing. Your Honors, on behalf of the appellees, I respectfully submit that this Court should affirm the judgment of the trial court with regard to the distribution of the escrow account. The trial court's determination that Atlas jumped the gun by terminating the purchase agreement too early was the correct decision based on the language of the contract. Trial court ruling gives meaning and effect to the entire agreement, and most importantly, Article VI of the agreement, which is the undisputed basis of Atlas's termination that set forth the most contemporaneous communication we have as to the reason for why the transaction did not close, and that is the April 3, 552 p.m. letter that Mr. Heiser sent to the sellers on behalf of Atlas. Under Ohio law, and particularly Ohio law as to anticipatory breach, would it matter if we thought that you would not have been able to meet your obligations by midnight? If the evidence were that it was absolutely impossible for the sellers to have been prepared to deliver title to the minimum acreage, if that were the evidence, I would agree that there are cases that stand for that. However, Ohio law does provide that all future performance upon an anticipatory repudiation can cease and the non-breaching party can proceed to sue for damages. The evidence in this case demonstrates that all the parties— What's an example of that from the cases? Perhaps if— You don't know from the cases? One example that can come to mind in this particular situation is if Mr. Croxton died and was not able to arrive at Mr. O'Brien's office to sign a lease. In this situation, the evidence is undisputed that all three parties that were part of getting the leases were basically about ready to get in the car and drive to Mr. O'Brien's office down the road, get some leases signed to finalize the very last two items that needed to be delivered before midnight. All this is in the—what remained to be done is in the summary judgment record, right? That is correct, Your Honor. And it would be your position, I assume, if there were minor items that you were capable of performing? Yes, the— I mean, not that that really—I'm not sure that makes any difference. I mean, there's—I don't think we're judging how—I don't know that we're judging how close you were unless, of course, it didn't make any difference anyway because of the impossibility of performance. Certainly, Your Honor. And the evidence was that essentially the last few remaining items were being ticked off on April 2nd and April 3rd, meaning the Huntington deeds for the Croxton-Caldwell properties, which—one of which was delivered, by the way, after 5.01 p.m. and Atlas had no problem with that. Mr. Peroli testified in his deposition that he accepted it. The countersigning of the Muskingum Watershed District modification, which Dr. Chrisman was going to sign and submit, as well as the proof of payment being simply the checks from Wainham and Enterprises to Croxton-Caldwell in satisfaction of the final conditions. Those were all going to be handled in short order that evening because the parties knew that if they didn't, the stagecoach was going to turn into a pumpkin at the stroke of midnight. So the parties all had everything to lose and everything to gain by making sure that that final arrangement was taken care of and then delivered according to the January—the January 28th letter by Atlas confirms that the documents were to be delivered to Atlas' Uniontown office right down the road from Alliance, and that was the plan, to get those documents and deliver them to Atlas prior to the stroke of midnight in accordance with the closing period, which, again, had no time frame but was anticipated to be midnight. And the— Does the record include evidence of that, that the parties discussed midnight as the closing? Because I didn't think it did. I don't believe that there's any explicit discussions about saying that it was midnight. Implicit, whatever. There is ample discussion that they knew that it had to get done that night and that they were— The 1159 comes from operation of law because the specific time is unspecified. Is that right? That's correct, Your Honor. But apart from that, they knew that they were working up against a deadline for that day to get it done, and everybody made arrangements to get over to Alliance to meet with Attorney Mike Loeglein to get the last two leases signed and delivered so that everything was delivered. And, again, the April 3, 2013 termination letter cites the reason being 6.2— well, actually, it cites 6.3, which is a nonexistent contract term. So that's the first issue. Argument to the trial court, which Her Honor did not accept, was that's a reason other than one of the permissible Section 1.2 reasons, which would result in the sellers getting the escrow anyhow. But her giving the buyers the benefit of the doubt and that it was simply a mistake in reference to 6.24, the provision clearly states that that's tied to closing and that the title defects, the curative instruments, the requirement is that the sellers be prepared to deliver that at or before closing, which they were going to do. And that, Your Honor, is the evidence with regard to that. While they stopped performance, they actually tried to reach out to ATLAS and ask that ATLAS rescind its revocation that evening. They reached out to them and said, you can't do this, let's move forward with closing, and ATLAS refused. So even though they didn't have a requirement to do that, they still tried and it didn't work. I don't know that this makes any difference in the analysis either, but did you provide at that point proof that you could perform? I believe, I don't think so. I think the communication was a brief one from counsel to counsel, from Mr. Rob Rao to Mr. Heiser. It might have been to Mr. Paroli, I don't have that email right in front of me, but I believe it was, you can't do this, it was too soon, anticipatory repudiation, let's move forward with closing. So clearly they knew of your legal position. Yes, yes. And nothing happened that day that would have changed their mind and have them reconsider. They simply said, that's it, we're done. Briefly, Your Honor, Your Honors, before my time expires, I'd just like to briefly mention our cross-appeal with regard to the count three claim. With regard to that claim, it's set forth in our brief, but with regard to that, the sellers acknowledged that any claim for consequential lost profits, such as royalties, would not be something that would be recoverable under the limitation of damages clause. However, the base contract price itself, weighed against the current market value after the slump in prices, would be a direct or compensatory damage that we believe that the trial court erred in reducing or eliminating that count three. I mean, am I correct in understanding that the damages you seek in that cross-appeal are the rest of the contract price? It would be, no, Your Honor, I think the proper measure of damages would be the contract price less the escrow, less whatever the current market value would be, a loss of the benefit of the bargain. Well, why doesn't, I mean, why isn't this very substantial escrow a liquidated damages, I mean, it's a liquidated damages provision. Why? Your Honor, I guess my position would be it doesn't strictly prohibit, the language itself doesn't prohibit additional damages. I think it simply says this is an escrow. It's an heiress money deposit. Am I, I'm correct that the district court's reasoning with respect to its being a liquidated damages provision was the size of the escrow? Your Honor, I think the trial court's analysis compared both the escrow provisions along with the limitation of damages provision that was in Article 7. Yeah. I'd forgotten about that. Yeah. I forgot about that. Her analysis was the working of those two made it a liquidated damages provision. All right. Your time's up if there are no more questions. Thank you, Your Honors. Mr. Freeman, on behalf of Mr. Croxton. Yes, thank you, Your Honors. May it please the court, I'm Sid Freeman. I am here on behalf of the unsuccessful intervenor at the trial court, Mr. Bo Croxton. I am here, Your Honor, to argue that the district court erred in failing to allow us to intervene. Now, I've been sitting here through the first arguments, Your Honor. Sorry. I kind of forgot. I actually have offered, and I'll continue to offer it. If I have five minutes, I'm only going to take one minute of your time, Your Honor. I really was not thinking about your case. It was just, sorry. I had forgotten, too. Life is full of ironies, I guess. We had a motion to intervene here, too. Well, full of irony and also full of truth. And I appreciate that, Your Honor, and so I won't take up much of your time. The truth is that at the point that our office got this case, summary judgment had already been granted. And I certainly, at that point in time, attempted, because I understood what was going to happen, is that if we didn't get the opportunity to intervene, then we would have to bring this as a state court action in order to protect his interest. And, of course, we didn't want to have to go two different places at the same time. Just to let you know, we have done that. We have filed the state court action, and that action has been stayed pending the outcome of this appeal. I take no position relative to the two parties. It's not Mr. Croxton's position here today to either be pro or con the arguments that are made in the other appeals that have been consolidated with ours. Our point here today is that if it should get reversed, for whatever reason, then there would be sufficient time. It would be our position to allow us to take the state court claims and ask to intervene, and I suppose to remove those cases, or the case that we now have in Tuscarawas County, and have it combined, consolidated with the case that then would be That's why I'm here. That's why we filed our brief. If there's no other questions. Thank you. Thank you. Thank you. Thank you. In terms of the sellers admitting that they were not titled owners of the sufficient acreage, they did that in their response to request for admission one. That's at page ID 2747. And you're talking about as of 501? That's correct, Your Honor. So there is no dispute about that. What's your view of this anticipatory repudiation as to whether the doctrine would apply if we think Chrisman would not have been able to meet its obligations by midnight? So in that instance, Your Honor, they could not successfully invoke anticipatory repudiation. Is there a case that comes to mind? In terms of the possibility? It's sort of like a harmlessness notion. You breached anticipatorily, and is that harmless in a sense because maybe they would not have been able to get these documents together? Is there a case? I don't remember that from your brief. Is there a case that supports this idea? I think Mr. Dingwell admitted that they have to show the ability to have performed their condition. Apparently, it seems like if there's case law saying they have to show their ability to perform, and I don't remember that being an issue in the case. Has your party conceded that they were able to perform by midnight? Oh, no, Your Honor. In fact, if the court doesn't agree with our interpretation of the contract, then the court should reverse on the issue of whether they're entitled to summary judgment on anticipatory repudiation in light of their inability to show that they were able to perform. Getting back to Judge Ketlik's question, I'm not aware of any case that says there's a harmlessness test. That's my own paraphrase. I note that the cases that we cited in our brief was Bagnoli, which does impose they must show that they had the ability to perform in order to successfully invoke anticipatory repudiation. That's helpful. Do you dispute they showed the ability? They have to show that in order to succeed. Did they? No, Your Honor. There's at least a material question of fact on that, and the important part, there's one smoking gun hot dock email. I'd like to focus the court's attention on. It was sent by the seller's attorney at 5-11 to a person who works at Huntington Bank, and their attorney told this person in an email to Huntington Bank, I just got off the phone with the principals in the deal, and we are apparently unable to complete the transaction today. The logistics at this hour are just too difficult. We may still be able to salvage the transaction, but we can't get it done tonight. So that alone should create a sufficient basis to create a genuine issue of material fact to go back to the trial court on the issue of anticipatory repudiation. Thank you. Thank you.